IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

BABATUNDE POPOOLA,
    Petitioner,

v.                                           Civil No. 3:25cv390 (DJN)

SAM SCALES, *et al.*,
    Respondents.

**MEMORANDUM OPINION**
**(Denying Respondents' Motion to Dismiss; Granting § 2241 Petition)**

Petitioner Babatunde Popoola ("Petitioner"), a federal inmate proceeding with counsel,

submitted a Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241 (ECF No. 1

("Petition" or "Pet.")) against Respondents Sam Scales, Residential Reentry Manager for the

Federal Bureau of Prisons in Baltimore, and Kevin Hudson, Superintendent of Rappahannock

Regional Jail.[1]  In his Petition, Petitioner challenges the Federal Bureau of Prisons' (the "BOP")

decision to transfer him from prerelease custody in a halfway house back to incarceration due to

his status as a non-citizen.  Petitioner raises his challenge under both the First Step Act ("FSA")

---

[1]      In a footnote to their Motion to Dismiss, Respondents contend that Kevin Hudson, the
Superintendent of Rappahannock Regional Jail, whom Petitioner named as a respondent, "is no
longer a proper defendant and should be dismissed," presumably because Petitioner no longer
resides at the Rappahannock Regional Jail. (ECF No. 23 at 1 n.1.)  Thus, the Motion to Dismiss
purports to have been filed only on behalf of Respondent Sam Scales.  (*Id.*)  The Court does not
dismiss Respondent Hudson, because "a respondent who has custody of the prisoner is within
reach of the court's process even though the prisoner has been removed from the district since
the suit was begun." *Ex parte Endo*, 323 U.S. 283, 307 (1944).
      The Court further notes that Rappahannock Regional Jail, where Petitioner resided when
filing this Petition, falls within this District, whereas FCI Oakdale, where Petitioner was later
moved, does not.  The Court nonetheless retains personal jurisdiction over Petitioner's claims,
because "habeas jurisdiction as a general matter continues to be in the district where the prisoner
was incarcerated at the time the habeas petition was filed." *Adepoju v. Scales*, 782 F. Supp. 3d
306, 316 (E.D. Va. 2025) (citations omitted).

and the Fifth Amendment's Due Process Clause, and he moves the Court to order Respondents to return Petitioner to prerelease custody as soon as possible. Respondents have filed a Motion to Dismiss and a memorandum in support of that motion, which also includes their response to Petitioner's § 2241 Petition. (ECF No. 23 ("Motion"); ECF No. 24 ("Memorandum" or "Mem.").) For the reasons set forth below, the Court will DENY Respondents' Motion (ECF No. 23) and will GRANT Petitioner's § 2241 Petition (ECF No. 1).

## I.    BACKGROUND

The Court begins by summarizing the undisputed facts underlying the Petition. On November 21, 2016, Petitioner was convicted of conspiracy to commit wire fraud (in violation of 18 U.S.C. § 1349); conspiracy to commit money laundering (in violation of 18 U.S.C. § 1956(h)); and aggravated identity theft (in violation of 18 U.S.C. § 1028A). Indictment, *United States v. Popoola*, No. 8:15cr277 (D. Md. May 18, 2015), ECF No. 1[2]; Jury Verdict, *Popoola*, No. 8:15cr277 (D. Md. Nov. 21, 2016), ECF No. 363. On March 20, 2017,[3] the United States District Court for the District of Maryland sentenced Petitioner to a term of 144 months' imprisonment, followed by three years of supervised release. Judgment, *Popoola*, No. 8:15cr277 (D. Md. Mar. 30, 2017), ECF No. 553 at 4. The sentencing court ordered that "the defendant shall be surrendered to a duly authorized immigration official for deportation in accordance with established procedures provided by the Immigration and Naturalization Act." *Id.*

---

[2]    The Court takes judicial notice of the docket in *United States v. Popoola*, No. 8:15cr277 (D. Md. May 18, 2015). *See Witthohn v. Fed. Ins. Co.*, 164 F.App'x 395, 396–97 (4th Cir. 2006) ("[A] court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint [without converting a Rule 12 motion to dismiss into one for summary judgment] so long as the authenticity of these documents is not disputed.").

[3]    Petitioner suggests that he was sentenced in 2015, (ECF No. 14 at 7), but the BOP records attached to his Memorandum in Support of his Petition show otherwise. (ECF No. 14-4 at 2.)

On July 17, 2024, Immigration and Customs Enforcement ("ICE") lodged a detainer against Petitioner. (ECF No. 14-4 at 5.) Petitioner represents, and Respondents do not refute, that ICE has not yet issued a final removal order against Petitioner. (ECF No. 14 at 7; Mem. at 4.)

While incarcerated, Petitioner earned FSA time-credits that the BOP could apply towards either early supervised release or a transfer to prerelease custody. (ECF No. 14-4 at 2, 6.) Pursuant to the BOP's application of 365 FSA credits towards his early supervised release, the BOP currently projects Petitioner's release date as January 22, 2026. (*Id.* at 2.) The BOP applied his remaining FSA credits towards a transfer to prerelease custody, transferring Petitioner to a halfway house on December 17, 2024. (ECF No. 14 at 8.)

Less than two months later, on January 30, 2025, the BOP issued a memorandum with the subject line, "Updated Guidance on Application of Federal Time-credits to Pre Release Custody for all Non-U.S. Citizens with an Active Detainer." (ECF No. 14-1 ("BOP Memorandum").) The BOP Memorandum states, in relevant part:

> The purpose of this memorandum is to provide updated guidance on the referral and placement of non-U.S. citizens with active detainers in pre-release custody, both Residential Reentry Centers (RRC) and Home Confinement (HC), as referenced in Program Statement 5410.01, First Step Act of 2018 – Time-credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4).
>
> **Cessation of Referral and Placement of Individuals with Immigration Detainers** [:] Effective immediately, pending placements in pre-release custody for application of Federal Time-credits (FTC) for all non-U.S. citizens with active detainers will be canceled. Cancelation will occur in all cases where a detainer is lodged and includes cases where a final order of deportation has not been issued.

(*Id.* at 2 (emphasis in original).)

On February 11, 2025, Respondents reincarcerated Petitioner. (Pet. ¶ 6.) After Petitioner was removed from his halfway house, the BOP placed him in a variety of jails, including

3

Rappahannock Regional Jail in Stafford, Virginia, where he resided when he filed his Petition. (*Id.* ¶ 2; Mem. at 4.) Since the filing of his Petition, the BOP transferred Petitioner to FCI Oakdale in Oakdale, Louisiana. (Mem. at 2.)

Petitioner alleges that the BOP provided him with no information regarding the reasons for his rearrest. (ECF No. 14 at 9.) He asserts that "[i]t is unclear if he was rearrested pursuant to the [BOP] memorandum, as that memorandum does not facially apply to Mr. Popoola, as he was not pending FSA Placement but had already been released to a halfway house." (*Id.*) Respondents, meanwhile, assert only that he was reincarcerated "because of his ICE detainer." (Mem. at 4.)

Petitioner filed the instant Petition on May 23, 2025, alleging that the BOP violated the FSA and the Fifth Amendment Due Process Clause by reincarcerating him contrary to the relevant statutory provisions and without notice or due process. (Pet. ¶ 13.) He submitted a memorandum in support of his Petition on July 11, 2025. (ECF No. 14.) On August 4, 2025, Petitioner requested expedited consideration of his Petition (ECF No. 19), which the Court denied. (ECF No. 22.) Respondents filed their Motion to Dismiss and Response to Petition on September 8, 2025. (ECF Nos. 23, 24.) Petitioner subsequently retained counsel and submitted his Response to Respondents' Motion to Dismiss on September 29, 2025. (ECF No. 29.) Respondents did not reply within the appropriate timeframe, rendering this matter ripe for judicial review.

## II.    STANDARD OF REVIEW

28 U.S.C. § 2241(a) provides that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241(a). "[A] federal court may grant habeas relief only

4

on the ground that the petitioner is in custody in violation of the Constitution or laws or treaties of the United States." *Torrence v. Lewis,* 60 F.4th 209, 213 (4th Cir. 2023) (cleaned up). After receiving a petition and the respondent's response, "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243. A habeas petition brought under 28 U.S.C. § 2241 is subject to the Rule 12 standards for dismissal. *See, e.g., Kabando v. Blinken*, 2021 WL 3929826, at *2 (E.D. Va. Sept. 2, 2021) (applying Rule 12(b)(6) standards to habeas petition); *Adepoju v. Scales*, 782 F. Supp. 3d 306, 312–13 (E.D. Va. 2025) (applying Rule 12(b)(1) and Rule 12(b)(6) standards to § 2241 petition).

A motion made pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges a court's jurisdiction over the subject matter of the complaint. A defendant moving for dismissal for lack of subject matter jurisdiction may either attack the complaint on its face, asserting that the complaint "fails to allege facts upon which subject matter jurisdiction can be based," or may attack "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *White v. CMA Const. Co., Inc.*, 947 F. Supp. 231, 233 (E.D. Va. 1996). In either case, the plaintiff bears the burden of proof to establish jurisdiction. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The Court must dismiss an action if it determines that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3). "Where a party has made both a Rule 12(b)(1) motion and a Rule 12(b)(6) motion, a court should address the 12(b)(1) issue first." *CSX Transportation, Inc. v. Norfolk S. Ry. Co.,* 2019 WL 4564564, at *6 (E.D. Va. Sept. 9, 2019).

A motion made under Rule 12(b)(6) tests the sufficiency of a complaint; it does not provide the means by which a court will resolve factual contests, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir.

5

1992). In considering a motion to dismiss, the Court must accept the well-pleaded factual allegations in the complaint as true and views the facts in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 1 F.3d 1130, 1134 (4th Cir. 1993). However, the court need not accept legal conclusions couched as factual allegations, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), nor "unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

Under Federal Rule of Civil Procedure 8(a), a complaint must state facts sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The complaint must state "more than labels and conclusions" or a "formulaic recitation of the elements," though the law does not require "detailed factual allegations." *Id.* Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. The facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

### III.    ANALYSIS

Respondents raise a variety of arguments for dismissal in their Motion.  The Court first reviews the relevant statutory scheme and then turns to Respondents' Motion.

### A.    Relevant Statutory Scheme Under the FSA and the BOP Memorandum

"The First Step Act established a system of mandatory time-credits" allowing early release from incarceration for "individuals who participate in recidivism reduction programming, with limited exceptions." *Valladares v. Ray*, 130 F.4th 74, 77 (4th Cir. 2025).  The FSA provision at issue, 18 U.S.C. § 3632(d)(4)(C), enables incarcerated individuals to obtain early supervised release or a transfer to prerelease custody if they earn sufficient time-credits.  Under that provision, any earned time-credits "shall be applied toward time in prerelease custody or supervised release." § 3632(d)(4)(C).  Where an inmate has earned sufficient credits, the BOP "shall transfer" such an eligible prisoner, "as determined under section 3624(g), into prerelease custody or supervised release." *Id.*  Under § 3624(g)(3), the BOP can apply a maximum of 365 credits towards early supervised release, but the statute does not cap the amount of FSA time-credits that the BOP may apply towards a transfer to prerelease custody. § 3624(g)(3).

The FSA prohibits two groups of inmates from earning FSA time-credits:  prisoners with certain disqualifying convictions and prisoners with final orders of removal. § 3632(d)(4)(D), (E).  Neither prohibition applies here.

On January 30, 2025, the BOP issued the memorandum at issue in this case, canceling *pending* placements in prerelease custody for all non-U.S. citizens with active detainers.  (ECF No. 14-1.)  The BOP Memorandum stated that "[a]pplication of [early time-credits] toward early

release to supervision for non-U.S. citizens with active detainers will not be affected."[4]  (*Id.* at 3.)

The Court notes the existence of a more recent memorandum by the BOP, which sheds additional light on the intended scope of the BOP Memorandum at issue in this Petition.  *See Mohammed v. Engleman*, 2025 WL 1909836, at *2 (C.D. Cal. July 9, 2025*), report and recommendation adopted*, 2025 WL 2294325 (C.D. Cal. Aug. 8, 2025) (discussing April 8, 2025 BOP Memorandum).  According to an April 8, 2025 memorandum, eligible inmates with immigration detainers (but without a final order of removal) may no longer apply FSA time-credits to prerelease custody; they may only apply the maximum of 365 time-credits to supervised release.  *Id.* at *2–3.  However, if an inmate is ineligible for supervised release, the BOP will allow FSA time-credits to be applied towards prerelease custody, subject to available resources.  *Id.* at *3.  In sum, under the April 8 memorandum, the BOP applies earned time-credits "to prerelease custody only in limited circumstances:  if the person's sentence includes no period of supervised release, or if mandated by a court order or settlement agreement."  *Id.*

---

[4]       Notably, the BOP promulgated a similar — albeit more sweeping — policy in 2022.
Under that policy, "prisoners with immigration detainers could earn time-credits, but could not apply them to prerelease custody or release to supervision unless the detainers [were] resolved."
*Mohammed v. Engleman*, 2025 WL 1909836, at *2 (C.D. Cal. July 9, 2025) (cleaned up), *report and recommendation adopted*, 2025 WL 2294325 (C.D. Cal. Aug. 8, 2025).  The BOP revised this policy after many district courts found its interpretation of the FSA inconsistent with the statute's plain language.  *See, e.g., Sierra v. Jacquez*, 2022 WL 18046701, at *3 (W.D. Wash. Dec. 27, 2022) (rejecting the BOP's argument in favor of its policy, because "[t]he statute's language specifically excludes only prisoners with a final order of removal from eligibility to apply FSA time-credits and contains no language that also includes prisoners who are removable or who have immigration detainers"), *report and recommendation adopted*, 2023 WL 184225 (W.D. Wash. Jan. 13, 2023); *Komando v. Luna*, 2023 WL 310580, at *6 (D.N.H. Jan. 13, 2023) ("Potentially removable noncitizens who are *not* the subject of final orders of removal are not within the scope of subparagraph [18 U.S.C. § 3632(d)(4)](E)(i)"), *report and recommendation adopted*, 2023 WL 1782034 (D.N.H. Feb. 6, 2023).

Reading the BOP's January 30, 2025 memorandum in conjunction with the BOP's more recent April 8 memorandum, the Court understands BOP's policy shift to constitute the following. According to the BOP, inmates with immigration detainers are no longer eligible to enter prerelease custody, even if they have earned sufficient FSA time-credits and could otherwise apply such credits towards prerelease custody, unless special circumstances apply. This includes non-citizen inmates who have earned in excess of 365 days of FSA time-credits: they are permitted only to use 365 days of that credit towards early discharge on supervised release. Thus, "[t]he new policy . . . effectively sets a 365-day cap on the [earned time-credits] that can be applied to [any form of] early release for most prisoners with immigration detainers." *Id.*

### B.    Respondents' Motion to Dismiss

In their Motion, Respondents assert a variety of arguments for dismissal of the Petition. Respondents first argue that Petitioner's claims are not cognizable in a § 2241 habeas petition. (Mem. at 6–7.) They also argue that the Court lacks jurisdiction over Petitioner's challenge to his transfer from prerelease custody under 18 U.S.C. § 3621(b).[5] (*Id.* at 9–11.) Respondents posit that Plaintiff has also failed to exhaust his remedies as required for a habeas petition. (*Id.* at 8–9.) Finally, addressing the merits of Petitioner's arguments, Respondents assert that

---

[5]    Respondents put forward their argument regarding § 3621's jurisdictional bar in support of their position that the BOP has not violated the FSA, but the Court construes Respondents' arguments regarding § 3621 as challenging the Court's subject matter jurisdiction. *See Adepoju*, 782 F. Supp. 3d at 315 (considering the relevance of § 3621's judicial bar in its jurisdictional analysis).

Petitioner's reincarceration violates neither the FSA nor the Due Process Clause of the Fifth Amendment. (*Id.* at 11–29.)

For the reasons set forth below, the Court will DENY Respondents' Motion to Dismiss (ECF No. 23) and will GRANT Petitioner's § 2241 Petition (ECF No. 1). The Court begins by determining that Petitioner's claim regarding his reincarceration constitutes a cognizable habeas claim, because the Court construes his claim as a cognizable challenge to the execution of his sentence in light of the mandatory provisions of the FSA. Next, the Court finds that § 3261(b) does not bar judicial review and that Petitioner's failure to exhaust available remedies stands excused here. The Court subsequently turns to the merits of Petitioner's FSA claim, finding that the BOP's actions in withdrawing Petitioner's prerelease custody based solely on his detainer violates the FSA. However, the Court does not find that Petitioner's reincarceration pursuant to this policy violates the Fifth Amendment Due Process Clause.

### 1.    Cognizability in Habeas

Respondents first argue that Petitioner's claims are not cognizable in habeas, as Petitioner's challenge pertains only to the conditions of his confinement, not the execution of his sentence. (Mem. at 6–7.) Whether a challenge to an inmate's transfer from a halfway house to a prison constitutes a challenge to conditions of confinement or to the execution of that inmate's sentence represents an unsettled question of law. For the reasons set forth below, the Court finds that Petitioner challenges the BOP's actions as overstepping the BOP's statutory authority under the FSA, which constitutes a challenge to the execution of his sentence and is thus cognizable in habeas.

"Section 2241 bestows upon district courts the power to grant habeas corpus relief to a 'prisoner' who 'is in custody in violation of the Constitution or laws or treaties of the United

10

States.'" *In re Wright*, 826 F.3d 774, 778 (4th Cir. 2016) (quoting 28 U.S.C. § 2241). When a petitioner challenges "the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973). "It is well established that attacks on the execution of a sentence are properly raised in a § 2241 petition." *Fontanez v. O'Brien*, 807 F.3d 84, 87 (4th Cir. 2015) (internal quotation omitted).

The Supreme Court has "left open the question whether [inmates] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus." *Ziglar v. Abbasi*, 582 U.S. 120, 144–45 (2017). Yet, the Supreme Court has intimated that an inmate's challenge to unjustified restraints during incarceration may be properly brought pursuant to a habeas claim. For instance, the Supreme Court has held that "[w]hen a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal." *Preiser*, 411 U.S. 475, 499 (1973). Further, it has implied that claims that seek to "terminate custody, accelerate the future date of release from custody, [or] reduce the level of custody" may proceed in habeas. *Skinner v. Switzer*, 562 U.S. 521, 534 (2011) (cleaned up). Most recently, it noted that "immediate physical release is not the only remedy under the federal writ of habeas corpus." *Trump v. J. G. G.*, 604 U.S. 670, 672 (2025) (cleaned up).

In the wake of *Preiser*, circuit courts have developed a split on whether challenging one's transfer to a higher level of custody relates to one's "conditions of confinement" or the execution of one's sentence. On one side, the First, Second and Third Circuits have found that claims involving transfers to a higher level of custody challenge the "manner of execution of a

sentence," not the conditions of confinement, and thus stand cognizable under habeas. *Muniz v. Sabol*, 517 F.3d 29, 33 (1st Cir. 2008) (finding claim challenging a regulation that restricted petitioner's transfer to a community corrections center cognizable under § 2241); *Levine v. Apker*, 455 F.3d 71, 77–78 (2d Cir. 2006) (same); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 241–42 (3d Cir. 2005) (same). By contrast, the Fifth and Eighth Circuits found that an inmate's petition for a transfer constitutes a conditions-of-confinement claim not cognizable in habeas. *See Melot v. Bergami*, 970 F.3d 596, 599 (5th Cir. 2020) (finding that a challenge to exclusion from program allowing home confinement for elderly prisoners is not cognizable in habeas); *Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996) ("If the prisoner is not challenging the validity of his conviction or the length of his detention . . . then a writ of habeas corpus is not the proper remedy"). Such findings are partially rooted in the perspective, held by some courts, that transfer to prerelease custody only alters "the *place* where a sentence is served," not "the fact or duration of imprisonment." *Reaves v. Garrett*, 2025 WL 890147, at *2 (E.D. Ark. Mar. 21, 2025) (citing *United States v. Houck*, 2 F.4th 1082, 1085 (8th Cir. 2021), *report and recommendation adopted*, 2025 WL 1118580 (E.D. Ark. Apr. 15, 2025).

The Fourth Circuit has not followed the Fifth Circuit's "'bright-line rule' . . . that if a favorable determination of the prisoner's claim would not automatically entitle him to accelerated release, then the proper vehicle is a civil rights suit." *Maxwell v. Thomas*, 133 F.4th 453, 454 (5th Cir. 2025). The Fourth Circuit has held "in several unpublished decisions . . . that claims challenging conditions of confinement cannot be brought in habeas petitions." *Timms v. U.S. Att'y Gen.*, 93 F.4th 187, 191 n.8 (4th Cir. 2024). And in a case involving a prisoner's challenge to both the deprivation of good conduct time and his intra-prison transfer to a maximum security prison facility, the Fourth Circuit differentiated between these claims, finding

12

the former cognizable in habeas, because it "challenges the duration of his confinement as impacted by the disallowance of his earned good conduct time," while rejecting the latter, because the challenge concerned only the *conditions* of his confinement, not its fact or duration. *Rodriguez v. Ratledge*, 715 F. App'x 261, 266 (4th Cir. 2017). However, and as relevant here, the Fourth Circuit found cognizable an inmate's claim that the BOP violated a statute in its administration of a BOP program for inmates, finding it a "challenge to the execution of a sentence." *Fontanez*, 807 F.3d at 87 (internal quotation omitted).

Despite the absence of clear Fourth Circuit authority, this Court recently found a challenge to the exact BOP policies at issue here cognizable under habeas. In *Adepoju v. Scales*, this Court construed a similar challenge to the BOP's reincarceration of an inmate in violation of the FSA as a claim related to the "execution of his sentence," and found the inmate's petition cognizable. 782 F. Supp. 3d at 315. *See also* Order, *McCandless v. Marshall*, No. 1:25cv1263 (E.D. Va. 2025), ECF No. 8 at 4 (noting that challenges involving the BOP's mandatory time credit application under the FSA may be cognizable in habeas). Out of circuit courts agree that habeas petitions challenging the BOP policy at issue here are cognizable in habeas. *See, e.g., Kuzmenko v. Phillips*, 2025 WL 779743, at *4 (E.D. Cal. Mar. 10, 2025) (finding a claim that the BOP's action exceeds its statutory authority under the FSA is cognizable in habeas).

The Court agrees with *Adepoju* and holds that the claim here is cognizable under § 2241. In contrast to the situation in *Rodriguez v. Rutledge*, where the Fourth Circuit declined to find cognizable the petitioner's challenge to his transfer from a federal penitentiary to a maximum security facility, here, Petitioner was removed from a halfway house back to a prison. 715 F. App'x at 266. As the Third Circuit aptly stated: "carrying out a sentence through detention in a halfway house is very different from carrying out a sentence in an ordinary penal

13

institution." *McGee v. Martinez*, 627 F.3d 933, 935 (3d Cir. 2010) (quoting *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 243 (3d Cir. 2005)) (cleaned up). As such, the Court finds Petitioner's challenge cognizable and rejects Respondents' argument to the contrary.

### 2. Subject Matter Jurisdiction

Respondents next argue that § 3621(b) insulates the BOP's transfer of prisoners between institutions from judicial review, and that therefore, the Court lacks subject matter jurisdiction to consider Petitioner's claims. Respondents present two arguments in support. First, Respondents argue that the FSA's time credit scheme does not actually establish a mandatory system for how the BOP must administer time-credits, because the statute's use of "shall" is not dispositive in the context of prison transfers, where the Executive Branch has long held discretion. (Mem. at 13–14.) Second, even if the Court found that the FSA's time-credit scheme constituted such a mandatory system, Respondents argue that § 3621(b)'s provision insulating BOP prison placement decisions from judicial review nonetheless applies to the BOP's placement of inmates in halfway houses. (*Id.* at 14–18.) Neither argument persuades the Court.

The Court turns first to Respondents' argument that the FSA does not impose a mandatory obligation on the BOP to apply FSA time-credits towards inmates' early supervised release or a transfer to prerelease custody. (Mem. at 13.) To resolve this issue, the Court turns to the starting point for any issue of statutory interpretation — "the language of the statute itself." *In re Rowe*, 750 F.3d 392, 396 (4th Cir. 2014). Section 3632(d)(4)(A) of Title 18 provides that a prisoner who is not otherwise ineligible and who "successfully completes evidence-based recidivism reduction programming or productive activities [] *shall* earn time-credits. . . ." § 3632(d)(4)(A) (emphasis added). Those earned time-credits "*shall* be applied toward time in prerelease custody or supervised release." § 3632(d)(4)(C) (emphasis added).

14

And where an inmate has earned sufficient credits, the BOP "*shall* transfer" such eligible prisoners "into prerelease custody or supervised release." *Id.* Notably, other provisions in the FSA use the permissive term "may" instead of "shall." *See, e.g.,* § 3632(d)(4)(E)(6) (stating that "[t]he incentives described in this subsection shall be in addition to any other rewards or incentives for which a prisoner *may* be eligible") (emphasis added); § 3632(e)(2) (stating that "any reduction that includes the loss of time-credits . . . shall not include any future time-credits that the prisoner *may* earn") (emphasis added).

The mandatory language in § 3632(d)(4)(C), especially when viewed in the context of the statute as a whole, clearly reflects Congress's intent to impose a mandatory obligation upon the BOP to award FSA time-credits to eligible inmates and apply such time-credits to supervised release or prerelease custody. The Fourth Circuit previously held as much, construing the relevant provisions to establish that the "award . . . of time-credits" under the FSA is "mandatory," and emphasizing the FSA's use of "shall" in support of that finding. *Valladares,* 130 F.4th at 79.

Respondents' argument that "shall" does not mean "shall" in this context founders in the face of the FSA's clear language directing the BOP to administer the FSA's time credit scheme. Respondents essentially argue that, where Congress uses the word "shall" in a "context that has a deep-rooted tradition of deference to the Executive," such as law enforcement or immigration enforcement, Congress doesn't actually mean what it says. (Mem. at 14.) This argument fails, because the mandatory language of the FSA's time credit scheme expressly indicates Congress's intent to require the BOP to administer time-credits under the FSA. *See Rowe,* 750 F.3d at 397 ("Young children learn early on that 'may' is a wonderfully permissive word. 'Shall,' by contrast, is more sternly mandatory. And whatever the merits of believing 'may' means 'shall,'

they do not apply when Congress has employed the two different verbs in neighboring statutory passages.") (cleaned up).  Respondents' analogies to statutes in the law enforcement and immigration enforcement context do not impact the Court's reading of the FSA, which sets out a clearly demarcated and structured system of time-credits that the BOP must award to eligible inmates.  The Court therefore finds that the FSA does not provide the BOP with discretion to refuse to apply FSA credits towards an eligible inmate's transfer to prerelease custody or early supervised release, given its repeated use of mandatory language.

Second, Respondents argue that, regardless of whether FSA time-credits constitute a mandatory scheme, § 3621(b) insulates the BOP's application of FSA credits from judicial review.  The Court begins by reviewing the complex interplay of statutes that underpins Respondents' argument.

Under 18 U.S.C. § 3621(a), the BOP retains custody of a person who has been sentenced to a term of imprisonment until that sentence expires or until they are "earlier released for satisfactory behavior pursuant to the provisions of section 3624," the statutory provision governing release of prisoners.  § 3621(a).  In § 3621(b), Congress provided the BOP with the discretion to designate the place of a prisoner's imprisonment during their incarceration. § 3621(b).  That provision specifies that "notwithstanding any other provision of law, a designation of a place of imprisonment *under this subsection* is not reviewable by any court." § 3621(b)(5) (emphasis added).

Respondents present a novel argument, based on the "broader statutory context," as to why § 3621's judicial review bar applies to § 3632(d)(4)(C), the FSA provision concerning how the BOP must apply earned FSA time-credits.  (Mem. at 14.)  Respondents begin by pointing out that § 3624(d)(4)(C) — the provision mandating that BOP transfer eligible prisoners who have

16

earned FSA credits into prerelease custody or supervised release — requires the BOP to consider § 3624(g) when making such eligibility determinations. *See* § 3632(d)(4)(C) ("The Director of the [BOP] shall transfer eligible prisoners, *as determined under section 3624(g)*, into prerelease custody or supervised release.") (emphasis added). In turn, § 3624(g) lays out eligibility criteria for those participating in the time credit system and the conditions of supervised release or prerelease confinement.

Meanwhile, § 3624(c)(1), which precedes § 3624(g), provides an alternate method of early release from incarceration unrelated to the FSA. Under that provision, Congress has vested the BOP with discretion to decide whether prisoners may spend a portion of their final months in reentry facilities, such as a halfway house, to afford such prisoners "a reasonable opportunity to adjust to and prepare for . . . reentry . . . into the community." § 3624(c)(1). Notably, Congress specified in the same subsection that "nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621"— the provision that includes the prohibition on judicial review discussed earlier. § 3624(c)(4); § 3621(b)(5). Stated more simply, § 3624(c)'s alternate method by which BOP may transfer inmates to supervised release or prerelease custody, and which does *not* involve FSA credits, does not permit judicial review.

Respondent's argument hinges on the bar to judicial review restated in § 3624(c) and its relationship to § 3624(g), the provision cross-referenced by the FSA for determining eligibility to participate in the time credit system. While § 3624(g) specifically declines to incorporate certain time limits set out in § 3624(c), it otherwise remains silent on whether § 3624(c)'s other provisions, and specifically its incorporation of § 3621's judicial review bar, apply to the BOP's eligibility determinations under the First Step Act. Based on that silence and on

17

§ 3632(d)(4)(C)'s incorporation of § 3624(g) for eligibility determination purposes, Respondents argue that § 3621(b)'s judicial review bar, which insulates the BOP's prerelease placement decisions under § 3624(c), also covers the BOP's placement of individuals in halfway houses pursuant to the FSA's time credit system in § 3632(d)(4)(C). (Mem. at 15.)

The Court rejects Respondents' highly attenuated argument, based on the statutory text and the overwhelming weight of the case law. A plain reading of § 3632(d)(4) does not reveal any Congressional intent whatsoever to bar judicial review of the BOP's administration of the FSA. Respondents point to such a bar in a separate statutory provision, § 3624(c), aimed at an entirely separate program for prerelease custody that has nothing to do with the FSA or the application of FSA credits. To posit that this provision applies to the FSA, merely due to its proximity to another provision that the FSA cross-references, *and without any statutory text whatsoever* to support this inference, stretches the bounds of statutory interpretation beyond all logical extremes.

The Court's reading of the statutory scheme finds support in other courts' near-universal consensus on this issue. These courts have found that the FSA imposes a mandatory obligation upon the BOP to award and administer FSA credits, and that administration of the FSA does not constitute a BOP decision involving the "designation of imprisonment," placing challenges to BOP decisions regarding prerelease custody or early supervised release under the FSA beyond § 3621(b)'s judicial bar. *See, e.g., Kuzmenko*, 2025 WL 779743, at *6 ("The fact that section 3624(g)(10) *limits* application of subsection 3624(c) in no way suggests that a separate provision contained in that section somehow applies to limit application of section 3632(d)(4)"); *Adepoju*, 782 F. Supp. 3d at 315 ("The BOP's plenary control over 'the place of [a] prisoner's imprisonment' under 18 U.S.C. § 3621[(b)] does not render inoperative the FSA's system of

mandatory time-credits [. . . ] [n]or does it strip this Court of its jurisdiction over Mr. Adepoju's claim that the BOP violated this provision of the FSA") (internal quotation removed); Order, *McCandless*, No. 1:25cv1263 (E.D. Va. Sept. 3, 2025), ECF No. 8 at 4 (finding that § 3621(b) barred review of the BOP's discretionary placement of a prisoner, but noting that § 3621(b) does not preclude review of a challenge to the application of FSA mandatory time-credits).[6]

Thus, the Court finds that § 3621(b)'s bar to judicial review does not apply to or insulate the BOP's decision to reincarcerate Petitioner, given the mandatory provisions of the FSA. Accordingly, the Court will DENY Respondents' Motion to the extent that it argues for dismissal of Petitioner's claim on the basis of subject matter jurisdiction.

### 3.    Exhaustion

The Court next turns to Respondents' argument that Petitioner has failed to properly exhaust his administrative remedies, and that this failure warrants dismissal of his Petition.

---

[6]    To be clear, courts in the Fourth Circuit have found that § 3621 bars review of the BOP's discretionary decisions regarding *precisely where an inmate is placed* under the FSA, and in so finding, have emphasized the BOP's power to determine an inmate's place of imprisonment. *See, e.g., Booker v. Bayless*, 2024 WL 3875031, at *4 (N.D.W. Va. Aug. 20, 2024), *aff'd*, 2025 WL 817172 (4th Cir. Mar. 14, 2025) ("Section 3632 does not impose on the BOP a specific and discrete duty amenable to review by this Court" when directing the BOP to make discretionary decisions, such as whether to place a prisoner in a halfway house *or* home confinement under the FSA's time credit scheme); *Andrews v. Ramos*, 2023 WL 1822837, at *1 (E.D.N.C. Feb. 8, 2023), *aff'd*, 2023 WL 3676776 (4th Cir. May 26, 2023) ("§ 3621(b) provides that the []BOP has exclusive authority to determine an inmate's place of imprisonment, including home confinement," and that this authority "is not reviewable by any court."). However, these cases are distinguishable from the instant scenario, which concerns the BOP's decision *not to apply* FSA credits to an *eligible* inmate's early release. In light of the FSA's language mandating such application, such a decision does not qualify as discretionary, and thus doesn't fall under § 3621's judicial review bar.

(Mem. at 8–9.)    The Court finds that good cause to waive the exhaustion requirement exists here and rejects Respondents' argument accordingly.

Before seeking judicial relief, inmates filing § 2241 petitions must, as a general matter, properly exhaust their administrative remedies. *Timms v. Johns,* 627 F.3d 525, 530–31 (4th Cir. 2010).   Failure to exhaust the administrative grievance process may warrant dismissal. *Medina v. Warden, FCI Petersburg Low*, 2024 WL 3012494, at *3 (E.D. Va. June 14, 2024).    Such failure "may only be excused upon a showing of cause and prejudice." *McClung v. Shearin,* 90 F. App'x 444, 445 (4th Cir. 2004).

Courts have recognized that petitioners can successfully establish cause when administrative remedies are futile or unavailable, the actions of the agency clearly violate statutory or constitutional rights or the administrative procedure fails to prevent irreparable harm. *Forbes v. Warden, FCI McDowell*, 2025 WL 849815, at *2 (S.D.W. Va. Mar. 18, 2025).    Courts have also noted that when an inmate's impending release date fast approaches, exhaustion of administrative remedies would moot the petitioner's claim and foreclose judicial review, weighing in favor of waiver. *Mohammed*, 2025 WL 1909836, at *5 ("[E]xhaustion would foreclose federal court review due to Petitioner's impending completion of his custodial term (which would moot his claim for release to [a residential reentry center].)").    Courts have also waived exhaustion on futility grounds where a petitioner's claim turns on a purely legal challenge to BOP policy. *Williams v. Warden, FCI Berlin*, 2025 WL 2207024, at *6 (D.N.H. Aug. 4, 2025) (citing the fact that Petitioner's "claim turns on a pure question of statutory interpretation" in finding that "it would be futile for [Petitioner] to pursue administrative relief within BOP").    Finally, the Court notes that, in analyzing habeas petitions that seek relief from the exact BOP policy at issue here, multiple district courts have waived exhaustion on the basis

20

that the petitioner's continued incarceration constitutes irreparable harm. *See, e.g., id.* (finding irreparable harm where requiring petitioner "to exhaust his claims would necessarily entail that he remains incarcerated while pursuing administrative relief, despite clear evidence that he has already passed the date by which he should have been released from incarceration and transferred to prerelease custody"); *Adepoju*, 782 F. Supp. 3d at 316 (same).

Here, Petitioner does not contest that he failed to fully exhaust his administrative remedies, but he argues that the exhaustion requirement should be waived. (ECF No. 14 at 10.) On February 25, 2025, mere days after his reincarceration, Petitioner filed an administrative grievance with the Rappahannock Regional Jail. (ECF No. 14-5 at 6.) The BOP denied the filing as not grievable, because Petitioner failed to file an Inmate Request Form before filing the administrative grievance. (ECF No. 14-5 at 7.) The BOP also noted that his "complaint is not a grievable issue," because it did not relate to conditions of confinement. (*Id.*) Petitioner did not appeal this denial within the BOP. (Pet. ¶ 8.) The Court notes that Petitioner's current release date on January 22, 2026, is mere months from now. (ECF No. 14-4 at 2.)

Based on the facts and the case law, the Court finds that good cause exists to waive the exhaustion requirement in Petitioner's case, for several reasons. First, Petitioner's approaching release date weighs in favor of waiver, because further administrative exhaustion would not be completed by his release date, and because such efforts could serve to foreclose judicial review. Further, appealing Petitioner's reincarceration to the BOP's administrative authorities would likely be a futile exercise, given the fact that the BOP already found that Petitioner's complaint "is not a grievable issue" and given the BOP's documented application of a nationwide policy of categorically transferring individuals with immigration detainers back to prison. *Williams*, 2025 WL 2207024, at *6. Finally, Petitioner's claim turns on a pure question of statutory

21

interpretation regarding the scope of the BOP's discretion to withhold FSA time-credits from an inmate based on an internal policy decision, further weighing in favor of waiver. *Id.* In light of these findings, and given the consensus among courts concerning waiver under these circumstances, the Court finds sufficient cause to waive the administrative exhaustion requirement in this matter, and will DENY Respondents' Motion as to this ground for dismissal.[7]

### 4.    FSA Violation

Having found that the merits of Petitioner's claims are properly before it, the Court now turns to Petitioner's claim that the BOP's decision to reincarcerate him violates the FSA. Respondents assert two arguments for why Petitioner's FSA claim fails and should be dismissed: (1) the FSA allows the BOP to revoke Petitioner's prerelease custody, because he constitutes a deportable non-citizen, regardless of whether a formal order of removal has been issued, and (2) the BOP may satisfy its FSA obligations by applying time-credits "only toward an inmate's term of supervised release" and is not required to award such credits towards prerelease custody. (Mem. at 18–26.) Both arguments hinge on questions of statutory interpretation. The Court analyzes each of Respondents' arguments in turn.

### i.    *Petitioner's Status as a Deportable Non-Citizen*

First, Respondents argue that the BOP's reincarceration of Petitioner does not violate the FSA, because the statute does not prohibit the BOP from withholding prerelease custody from deportable non-citizens, even if they lack a formal order of removal. As explained below, the Court disagrees with Respondent's interpretation of the FSA, which fails to find support in the statutory text.

---

[7]    Given the various factors supporting waiver, the Court need not address whether Petitioner suffers irreparable harm as a result of his reincarceration.

The plain text of the FSA provides only two circumstances wherein an otherwise eligible inmate may be excluded from receiving time-credits: if he is serving a sentence for certain crimes of conviction, or if he is "the subject of a final order of removal under any provision of the immigration laws." § 3632(d)(4)(D), (E)(i). A separate provision requires the Attorney General to ensure that certain removable non-citizens who seek to earn FSA time-credits, including those with aggravated felonies like Petitioner, "are subject to [removal] proceedings [. . .] at a date as early as practicable during the prisoner's incarceration." § 3632(d)(4)(E)(ii).

Respondents do not dispute Petitioner's assertion that he lacks a disqualifying criminal conviction or a final order of removal. (ECF No. 14 at 13.) Further, Respondents do not dispute that Petitioner had accrued enough time-credits to be released to prerelease custody, and that he was in fact released to prerelease custody pursuant to the FSA. (ECF No. 14 at 7–8; Mem. at 4 ("Under the First Step Act, Popoola was transferred to a residential reentry center").)

Rather, Respondents argue that Petitioner's reincarceration was legal under the First Step Act on the basis of § 3632(d)(4)(E)(ii), the provision requiring the Attorney General to ensure that certain non-citizens be subject to removal proceedings "at a date as early as practicable during [. . .] incarceration." (Mem. at 20–21;) § 3632(d)(4)(E)(ii)). In support, Respondents point out that even though Petitioner lacks a final order of removal, he nonetheless constitutes a non-citizen subject to removal proceedings during his incarceration, since his convictions render him deportable and thus place him within § 3632(d)(4)(E)(ii)'s ambit. (*Id.*) In light of that provision's directive to place deportable non-citizens in removal proceedings "as early as practicable," Respondents assert that this Court should not read the FSA as mandating Petitioner's transfer to prerelease custody, because doing so would render the requirement for

expeditious removal proceedings during incarceration "superfluous, void or insignificant." (*Id.* at 23.)

This Court joins many others in rejecting Respondents' argument, which directly contradicts the plain text of the FSA. As this Court recently explained in *Adepoju*, § 3632(d)(4)(E)(i)'s "unambiguous language" exempting only those non-citizen inmates with a final order of removal from earning FSA time-credits renders it "evident that Congress considered which classes of deportable prisoners would be ineligible to apply time-credits to prerelease custody and decided that only those who are the 'subject of a final order of removal' would be ineligible." *Adepoju*, 782 F. Supp. 3d at 319 (quoting § 3632(d)(4)(E)(i)). In discussing the Attorney General's duty to expedite removal of deportable inmates, the Court found that this provision "does not [. . .] somehow nullify the FSA's explicit mandate that the BOP 'shall transfer eligible prisoners [. . .] into prerelease custody.'" *Id.* (quoting § 3632(d)(4)(C)). Rather, that provision merely directs the *Attorney General*, not the BOP, to ensure that deportable noncitizens seeking to earn time-credits are subject to removal proceedings as early as practicable during their incarceration. As the Court framed it, Respondents seek an interpretation of the FSA "that is plainly at odds with the statutory language by finding that the BOP may elect *not* to transfer to prerelease custody one class of eligible prisoners — deportable noncitizens." *Id.* The Court found this argument was "untenable" and noted that "no court, including this one, has read the statute" as Respondents do. *Id. Adepujo*'s logic and its conclusions apply with equal force in this case, and the Court adopts the above reasoning in full.

The Court's conclusion that § 3632(d)(4)(E)(ii) fails to excuse the BOP's non-compliance with the FSA and refusal to apply Petitioner's time-credits towards prerelease

custody finds support in other courts outside of the Fourth Circuit, which have similarly found that Respondents' argument contradicts the plain language of the FSA. *See, e.g., Mohammed*, 2025 WL 1909836, at *13 ("Congress explicitly contemplated the extent to which noncitizens should be afforded the opportunity to apply FSA Credits to prerelease custody, concluding only that prisoners who are the 'subject of a final order of removal under any provision of the immigration laws' are ineligible to do so") (quoting § 3632(d)(4)(E)(i)); *[Redacted] v. Fed. Bureau of Prisons*, 2023 WL 9530181, at *5 (S.D.N.Y. Dec. 28, 2023), *report and recommendation adopted sub nom. Doe v. Fed. Bureau of Prisons*, 2024 WL 455309 (S.D.N.Y. Feb. 5, 2024) ("[T]here is already a consistent line of cases from across the country holding that [ . . . ] the BOP may not add additional requirements beyond the definition of eligible prisoners provided for in the statute"). As one court put it, "[i]f it had been Congress' intention to render noncitizens like Petitioner who are subject to immigration detainers — though *not* a final order of removal — ineligible to apply [earned time-credits], Congress presumably would have said so." *Wesa v. Engleman*, 2025 WL 2005224, at *8 (C.D. Cal. June 6, 2025) (internal quotation omitted). Further, an amendment to the FSA that would have "specifically exclud[ed] prisoners with 'immigration detainers' from applying their earned time-credits [] was offered on the floor of the Senate but did not pass," further corroborating the inference that Congress did not intend to bar prisoners with detainers from earning and applying time-credits under the FSA. *Komando v. Luna*, 2023 WL 310580, at *6 (D.N.H. Jan. 13, 2023), *report and recommendation approved sub nom. Komando v. FCI Berlin, Warden*, 2023 WL 1782034 (D.N.H. Feb. 6, 2023); *see* 164 Cong. Rec. S7658-02 (Dec. 17, 2018) (proposed amendment specifically excluding prisoners with immigration detainers).

To the extent that certain cases have arrived at a different conclusion, the Court finds these cases distinguishable.  In the majority of these cases, courts encountered petitioners who, unlike this Petitioner, were already subject to final removal orders at the time of litigation or who were subject to detainers indicating that a final order of removal had already been entered against them.  *See, e.g., Martinez-Polanco v. Warden, FCI Fort Dix*, 2025 WL 1511192, at *4 (D.N.J. May 27, 2025) (petitioner was subject to a final order of removal after a detainer at the time of litigation); *Duffis v. Thompson*, 2023 WL 3876496, at *2 (M.D. Pa. May 10, 2023) (final order of removal against petitioner was reflected in the detainer); *United States v. Rios-Villanueva*, 2023 WL 186804, at *6 (D.S.C. Jan. 13, 2023) (same).  To the extent that these courts found a detainer like Petitioner's to constitute the sole basis relied upon by the BOP in denying the application of FSA credits, the Court finds the reasoning behind these decisions unpersuasive in the face of the FSA's unambiguous statutory text.

For all of these reasons, the Court holds that the FSA does not permit the exclusion of non-citizens with detainers from earning and applying FSA time-credits and rejects Respondents' argument to this effect.

### ii.    *The BOP's Application of FSA Credits to Supervised Release Only*

Respondents next argue that the BOP's obligations under the FSA are satisfied nonetheless, because the BOP may choose to apply FSA time-credits exclusively towards an inmate's term of supervised release, rather than towards both supervised release and prerelease custody.  Here, the BOP has agreed to apply 365 of Petitioner's earned FSA credits towards his supervised release, but, as evidenced by its reincarceration of Petitioner, refuses to apply the remaining balance of his FSA credits towards prerelease custody.  The BOP's reincarceration of Petitioner in this instance reflects the directive set out in its April 8, 2025 memorandum to apply

26

a maximum of 365 FSA time-credits towards non-citizen inmates' early supervised release, but not to apply any remaining credits to prerelease custody. *See Mohammed*, 2025 WL 1909836, at *2–3 (discussing the BOP's April 8, 2025 memorandum). Respondents justify Petitioner's reincarceration (and, by extension, the BOP's new policy) by focusing on the FSA's use of the disjunctive word "or" when laying out the time credit application process. (Mem. at 25–26;) *see* § 3632(d)(4)(C) (FSA time-credits "shall be applied toward time in prerelease custody *or* supervised release," and the BOP "shall transfer eligible prisoners . . . into prerelease custody *or* supervised release.") (emphases added).

The Court finds the disjunctive language of the statute insufficient to cloak the BOP's denial of Petitioner's earned time-credits with legitimacy. The Court begins by reviewing the statutory text and relevant case law before proceeding to its analysis. As already discussed, § 3632(d)(4)(C) requires FSA time-credits to be applied toward time in prerelease custody or supervised release and requires the BOP to transfer eligible prisoners into one of those two statuses. However, § 3624(g)(3) caps the number of FSA credits that the BOP can apply towards early supervised release at 365 time-credits. *See* § 3624(g)(3) ("[T]he Director of the Bureau of Prisons may transfer the prisoner to begin any such term of supervised release at an earlier date [than the scheduled end of imprisonment], *not to exceed 12 months*, based on the application of time-credits under section 3632") (emphasis added). The statute does not explicitly address the BOP's obligations in the present scenario, where a prisoner with an immigration detainer has earned more than 365 time-credits — that is, more than he can legally redeem for supervised release — and can thus apply the remaining balance of his credits only through prerelease custody.

No district court in the Fourth Circuit has previously analyzed whether, after applying 365 FSA credits towards an inmate's early supervised release, the BOP may refuse to apply FSA credits to that inmate's transfer to prerelease custody on the basis of an immigration detainer alone. However, other courts considering this question have consistently found that, after applying 365 credits towards early supervised release, the BOP must apply an inmate's remaining time-credits towards prerelease custody, and that immigration detainers do not justify denying inmates the FSA credits that they have rightfully earned. *See [Redacted]*, 2023 WL 9530181, at *5 (noting that after the BOP applied 365 credits towards supervised release, the FSA requires the BOP to also apply the inmate's additional FSA credits towards prerelease custody in light of the "consistent line of cases from across the country holding that 18 U.S.C. § 3632(d)(C) does not afford the BOP any discretion in releasing eligible prisoners); *Williams,* 2025 WL 2207024, at *5 (same, based on "the consensus among district courts . . . that BOP may not rely solely on immigration detainer[s] to deny application of credits earned under the statute") (cleaned up); *Mohammed,* 2025 WL 1909836, at *14 (finding no basis in the statutory scheme to support the BOP's policy of effectively capping the amount of FSA credits at 365, regardless of the number of credits that inmate earned.)

Although at least two courts have found that the BOP enjoys some discretion in determining prerelease custody transfers under the FSA, these opinions concerned the BOP's discretion as to *when* such a transfer should occur, not *whether* such a transfer could occur at all. In *Rodriguez v. Hutchinson,* 2025 WL 889525 (D.S.C. Jan. 7, 2025), *report and recommendation adopted,* 2025 WL 888897 (D.S.C. Mar. 21, 2025), the BOP applied 365 of the petitioner's total earned time-credits towards supervised release and applied some, but not all, of the petitioner's additional credits towards prerelease custody. *Id.* at *2. That court found that "the BOP has the

28

discretion to apply [Petitioner's] credits in the way it has been applied, and this court has no discretion to modify the BOP's decisions." *Id.* at *3. Similarly, in *Crowe v. Fed. Bureau of Prisons*, 2025 WL 1635392 (D.D.C. June 9, 2025), the court held that "the BOP's decision where — and thus when — to transfer a prisoner to prerelease custody remains subject to the same array of considerations that Congress set forth in § 3621(b)." *Id.* at *23. *Crowe* and *Rodriguez* stand inapposite here, because both involved petitioners who challenged the BOP's *untimely* transfers to prerelease custody, rather than the BOP's categorical decision not to apply FSA credits towards prerelease custody at all for inmates with immigration detainers.

Upon review of the statutory text and the relevant case law, the Court finds that Respondents' argument fails. As the statutory text clearly demonstrates, the FSA crafted a statutory scheme that *requires* the BOP to apply eligible inmates' earned FSA credits. While Respondents are correct that the statutory language affords the BOP discretion in whether to allocate those credits to supervised release or prerelease custody, nothing in the statute supports Respondents' assertion that the BOP may, by way of such discretionary determinations, fail to apply — and thus effectively nullify — hundreds of extra time-credits that an inmate earned, and which the FSA entitles him to redeem. Given the 365-day statutory cap on applying FSA credits towards supervised release, the Court finds that, under the FSA's plain text, any credits above and beyond that number must be applied towards prerelease custody. The BOP cannot undermine the FSA's entire statutory scheme in the name of "discretion." In so finding, this Court joins its fellow courts' "consensus" that the "BOP may [not] rely solely on immigration detainer[s] to deny application of credits earned under the statute." *Williams*, 2025 WL 2207024, at *5.

Thus, the Court finds that the reincarceration of Petitioner pursuant to the BOP's policy violated the FSA. Although the BOP applied 365 credits towards Petitioner's supervised release, its refusal to apply any additional credits towards his transfer to prerelease custody violates the FSA's mandatory provisions requiring the BOP to award eligible inmates their earned FSA credits. On that basis, the Court will DENY Respondents' Motion to the extent that it argues that Petitioner's petition should be dismissed for lack of an FSA violation and will GRANT Petitioner's § 2241 Petition on these grounds.

### 5. Due Process Violation

The Court finally turns to Petitioner's Fifth Amendment Due Process claim. Respondent argues that this claim must be dismissed, because (1) the FSA does not create an objective expectation in a transfer to prerelease custody and (2) transfer from a halfway house to a federal correctional institution does not impose an "atypical and significant hardship" upon Petitioner. (Mem at 27–29;) *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Court finds that Petitioner fails to demonstrate that his reincarceration violated the Fifth Amendment's Due Process clause, because his reincarceration did not pose an atypical and substantial hardship relative to the normative baseline of his sentence, as the case law requires.

The Due Process Clause of the Fifth Amendment applies when government action deprives an individual of a legitimate liberty or property interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569–70 (1972). A prisoner's liberty interest in avoiding transfer to more adverse conditions of confinement does not arise directly from the United States Constitution, but may arise from state or federal policies or regulations. *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005); *Adepoju*, 782 F. Supp. 3d at 319.

30

When analyzing the merits of a due process claim in a habeas corpus petition, the Court must identify whether the Government conduct at issue affects a protected interest, and then must evaluate whether the pertinent statute "creates sufficient limits on official discretion such that it could be deemed to create a liberty interest." *Puranda v. Johnson*, 2009 WL 3175629, at *3 (E.D. Va. Sept. 30, 2009).

To show that the deprivation "holds sufficient significance to warrant [constitutional] protection," an inmate must show that his confinement conditions amount to an "atypical and significant hardship" or that they "inevitably affect[] the duration of his sentence." *Id.* at *4 (quoting *Sandin*, 515 U.S. at 484). In analyzing the sufficiency of the inmate's showing, courts first determine the "normative baseline" of prison life for "this particular inmate," which are those "conditions dictated by a prisoner's conviction and sentence." *Incumaa v. Stirling*, 791 F.3d 517, 527–28 (4th Cir. 2015). With that baseline established, courts subsequently determine whether the prison conditions impose atypical and substantial hardship in relation to that norm. *Id.* at 527.

This Court's prior opinions have diverged regarding whether an inmate's removal from a halfway house to a federal prison imposes an atypical and significant hardship for due process purposes. In *Adepoju*, the Court found that such a removal imposed such a hardship, based on its analysis of the petitioner's baseline prison condition, which it construed as relative to serving his sentence in a halfway house. *Adepoju*, 782 F. Supp. 3d at 320. However, at least one other opinion by this Court has made clear that an inmate's mere transfer from a halfway house to a federal prison cannot, by itself, constitute an atypical hardship, because the relevant baseline condition of an inmate's sentence does not include prerelease custody. *Riley v. Adams*, 2005 WL 6124307, at *1 (E.D. Va. Sept. 23, 2005), *aff'd*, 196 F. App'x 151 (4th Cir. 2006); *see also*

*Sanko v. McDonnell,* 2007 WL 5745934, at *1 (E.D. Va. Aug. 1, 2007), *aff'd,* 283 F. App'x 166 (4th Cir. 2008) ("Plaintiff's due process rights are not implicated by his routine housing assignment unless the conditions of his confinement diverge so substantially from expected prison conditions as to create an 'atypical and significant hardship on [him] in relation to the ordinary incidents of prison life.'") (quoting *Sandin,* 515 U.S. at 484). Where a petitioner challenged the BOP's cancellation of a boot camp program, the completion of which would have placed him in a halfway house, the Court found that the petitioner could have no "constitutionally protected liberty interest in being housed at any particular institution unless the conditions of confinement at the new facility diverge so substantially as to create" an atypical hardship. *Riley,* 2005 WL 6124307, at *1. The Court described the cancellation of the boot camp and, in turn, the deprivation of prerelease custody, as a "transfer or suspension of transfer of an inmate," which falls "within the range of confinement justified by a prison sentence." *Id.* at *2. Because the BOP routinely transfers inmates between institutions, the Court held that the BOP's refusal to allow an inmate to finish his sentence from a halfway house failed to constitute an atypical hardship relative to an inmate's normative baseline of incarceration pursuant to his prison sentence. *Id.*

The Court agrees with the holding in *Riley* and finds that Petitioner's reincarceration does not affect a protected interest for purposes of the Fifth Amendment Due Process Clause. To unconstitutionally infringe upon Petitioner's liberty interest, the BOP's reincarceration of Petitioner must have either affected the duration of his sentence or amounted to an atypical hardship relative to the baseline of his sentence. Since the application of FSA credits towards prerelease custody has no impact on the duration of Petitioner's sentence, Petitioner must show that his reincarceration amounts to an atypical hardship relative to the baseline of his sentence.

32

Petitioner fails to do so. Having been sentenced to an extended period of incarceration, and having served time in such a setting before his transfer to prerelease custody, Petitioner's baseline self-evidently constitutes incarceration in a prison. A transfer back to incarceration thus does not constitute a divergent hardship relative to his baseline condition mandated by his conviction and sentence, which is required to establish a protected interest. Further, Petitioner's placement in a halfway house pursuant to his earned FSA time-credits does not constitute an integral part of Petitioner's sentence, because a "transfer or suspension of transfer of an inmate" to or from prerelease custody falls "within the range of confinement justified by a prison sentence." *Id.*

Because the Court finds that his reincarceration does not impose an "atypical and significant hardship" relative to the nature of his sentence, it need not consider whether the FSA creates a liberty interest in earning FSA credits. *See id.* (dismissing petitioner's claim after concluding petitioner failed to show atypical or significant hardship). Petitioner's Fifth Amendment Due Process claim thus fails.

## IV.    CONCLUSION

For the reasons set forth above, the Court will DENY Respondents' Motion to Dismiss (ECF No. 23).  Further, because the BOP has violated the FSA, the Court will GRANT Petitioner's Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241 (ECF No. 1).

An appropriate order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  December 3, 2025